All rise. Please be seated. Next case on this morning's docket is People of the State of Illinois v. Joseph Draffen. We have Ms. Randolph for the appellant and Ms. Shanahan for the appellee. And you may begin, Ms. Randolph. Thank you, Your Honor. May it please the Court, Ms. Shanahan. I'm Assistant Defender E. Joyce Randolph of the 5th District Office of the State Appellate Defender. I represent Joseph Draffen in this, which is the direct appeal of his conviction for home invasion and sentence of 16 years imprisonment. We argued in our brief that Mr. Draffen was denied effective assistance of counsel when counsel failed to request jury instruction on credibility of an accomplice and also failed to take necessary steps to prevent the jury from hearing prejudicial testimony regarding what could be construed as prior bad acts and misconduct. We're only focusing on the first part of the argument today. We'll stand on the brief with regard to the second part unless the Court has specific questions about that. The facts of the case, as briefly as I can recall them, we have an elderly man, Mr. Modulin. He's hit on the back of the head in his house between 11.30 p.m. and 12.30 a.m. And this is in Metropolis, Illinois. He has a neighbor across the road who says that he saw a white SUV stop between the two houses, let one person out, and that person walked toward Mr. Modulin's house. SUV drove away, came back a few minutes later, and the other person got back into the SUV and they left. And, of course, the police are called, and Mr. Modulin goes to the hospital in Paducah, Kentucky, for treatments just across the river. People apparently traverse back and forth between Metropolis and Paducah quite frequently. Anyway, while he's at the hospital, his daughter-in-law tells the police that he's been seeing Mr. Modulin's 83, I think the record says, and his daughter-in-law says he's been seeing a much younger woman in her 40s, which would be Cindy Featherston. Mr. Modulin's wife had died a few months before this. Now, the police want to interview Featherston, but before they can go out and find her, she comes to them and lays out this story about how Greg Peppers talked about robbing Modulin and made her show him where Modulin lived, and Peppers and Draffin must have done this dastardly deed against Mr. Modulin, and makes a big deal about how she's had a stroke and she's easily confused. She had a stroke a few years ago and she's easily confused, and she's just so scared of Greg Peppers. There's no forensic evidence in the case. There was blood found in various places in Mr. Modulin's house, but nothing connected to a perpetrator or perpetrators. Mr. Modulin never saw who hit him, and by the time of trial, he had absolutely no memory of the incident at all. Now, the defense theory of the case is that Featherston is the one who's Peppers' accomplice, but she's trying to make Draffin look like the accomplice, and the defense argued that she was not worthy of belief, even though she had the police and the prosecutor believing her to the point that she wasn't even charged with the offense. Now, the state says she's not an accomplice, so why would IPI 3.17 have even been tenured by the defense? Well, as I said before, that's the defense theory of the case. She's the accomplice and not Mr. Draffin. Now, she's an accomplice. We're arguing that she's an accomplice because she admitted that she showed Peppers where Modulin lived when she knew that Peppers was planning something that would probably get Modulin hurt. She testified that Draffin was not there when she showed Peppers the house where Modulin lived. There's no forced entry to the house, and she admits that she knew about the key under the mat, but of course she says that she didn't tell Peppers or anybody else about the key. She admitted that she called Modulin that night, although she denied that she ever did it to see if Modulin was home. And her son saw her at her home in Metropolis with just Peppers there sometime between 10 o'clock and 11 o'clock when her son left to go spend the night with a friend in Paducah. So she had the opportunity to commit the crime with Peppers after her son left, and defendant is not there. So at that point, that's certainly enough evidence to justify a jury instruction on the defense theory of the case, that she's the accomplice. Didn't the victim tell the police that two white men had attacked him? Well, I think that's something that he may have told the neighbor, the neighbor's daughter, when she came home from work about 12.30 and heard him hollering for help. Well, you say it in your belief. I thought that there was a statement to the police that was given shortly after the attack. Well, there may have been, but in any event, Mr. Modulin clearly was attacked from behind, and whether that was just supposition on his part or he actually saw two white men, he said later on he had absolutely no recollection of the crime. So at trial, he didn't testify. Was there evidence presented that he had told the police that he was attacked by two white men? I think maybe the first officer at the scene might have said that, although whether he said that or whether Modulin told the neighbor that, I'm not sure. Well, your brief says he told the police. Okay. Okay. Well, we'll go by that then. But anyway, so now as I said before, defense counsel is arguing to the jury that Featherston was the accomplice that drove Peppers to the house. Peppers was the one that got out of the SUV. And again, we have to remember that the neighbor said he just saw one person get out of the house, or get out of the SUV. And his whole point is that she's lying to get the police's attention away from her. Now, he still didn't submit any jury instruction. Ms. Randolph, if you are contending that Ms. Featherston was the accomplice, you're not contending that she was there at the time of the crime, are you? I think the defense theory of trial was that she was the one driving the SUV, and Peppers was the one that got out. We'll agree that just knowledge of a crime is not enough to base an allegation that someone is an accomplice on, is it? Well, the case of furtherance of the crime itself, more than just being aware that a crime is about to be committed or is going to be committed? Well, the cases on accountability are probably all over the place as to what amounts to furtherance of the act. But I would say just as a general statement, that's probably true of what you said. In fact, I guess going along, if it was just awareness, the son could have been charged as well, correct? Didn't he provide a lot of the same information about that Peppers was there and that they were talking about? I don't believe the son ever testified he heard anything about any plan to do anything to Modglin. Okay, we'll have to look at the record for that. I may be mistaken. I thought he was aware of the entire transactions that went on after Mr. Modglin left the home and Peppers was there and they were discussing it. Well, there's actually two events that we're talking about here, okay? One is I can never exactly get it really clear what day it was, but I think it was like Sunday when he went over to Ms. Featherston's house and Peppers was there. And Mr. Modglin gets all upset about, you know, you're cheating on me with another man. I've given you all this money and all this other kind of stuff. And the son saying that Peppers came out and, you know, laughed at Mr. Modglin and then I think he may have seen his mother and Peppers talking afterward. That was on Sunday. Now, the man was attacked somewhere around midnight, either Wednesday, Thursday, you know, Wednesday night into Thursday morning or Thursday night into Friday morning. But these are two different things. Now, the son mainly testified about what happened on Sunday, okay? And the son did testify that, yes, that night that Mr. Modglin was attacked, Peppers had been over there and he'd seen Mr. Drafton over there at his mother's house. But he never testified that he heard anything about any plan to do anything to Mr. Modglin. I have one more question. Was there any testimony that there was maybe two white vehicles? Somebody owned a, well, there was a SUV. That is, but was there another white vehicle mentioned at all or just the one? And one had made a loud sound or am I confusing with another case? Well, Mr. Peppers' case is also before this court. I think it might have been argued earlier this month or maybe earlier this week, I don't know. Now, whose SUV was that? Well, the, it was Mr. Peppers' SUV. It was titled to Mr. Peppers? Okay, that's all I know for the record. Well, I mean, nobody ever definitely said, okay, this SUV with this VIN number and this license plate was the one that was there and that's the one that belongs to Greg Peppers. But Peppers did own a white SUV. Yes, I believe it was a Chevy Blazer. Okay. Are there any other questions? No. Thank you, Ms. Randolph. You'll have the opportunity to rebut. Ms. Shanahan, you may begin. May it please the court, counsel, my name is Sharon Shanahan and I represent the people of the state of Illinois. I would like to just briefly touch on a couple of questions that the court raised before I get into my argument. Officer Tim Davis testified that when he first arrived at the victim's home, the witness told him that two males had entered his residence. And that's on C-136 of the record. So he did say that. There's also testimony, it's not really discussed in either brief, but it is contained in the record on appeal of the doctor that examined the victim after he was at the hospital. And he noted that it's not at all uncommon with a head injury like the victim had that he would forget about the actual incident itself later on. Apparently brain swelling occurs and this can cause it. So it's not at all unusual that a little bit later the victim didn't remember who attacked him or how many people. As far as the vehicles involved with this, the only white vehicle in this case is a white SUV. There is testimony that the vehicle was Pepper's. Pepper's did not have a driver's license and so he frequently asked the defendant to drive that vehicle for him. And I think it's pretty well undisputed that the defendant had that SUV that night. He drove Pepper's to Ms. Featherston's house in that vehicle. He then, even according to his own testimony, he drove it back to Paducah. And depending on which version of the story you buy, he stayed in Paducah or else he then drove the white SUV back to Ms. Featherston's at a later point in time. So the only white vehicle in question was under the control of the defendant for the entire evening. Essentially dealing with the first issue here, it can't be ineffective assistance of counsel to ask for a jury instruction if the jury instruction wouldn't have been given. In order for this instruction to be given, there must be some evidence that Ms. Featherston was an accomplice. And the test is whether there's probable cause to believe that the witness was guilty as a principal or as an accessory under an accountability theory. That means that if the person is conscious that the crime is being committed in his presence, he won't be held accountable merely for failing to oppose or stop the crime. So the fact that Ms. Featherston was present when Mr. Pepper said he was going to do this doesn't mean that she was accountable. But it wasn't even intended, was it? No, it was not intended. So we don't know whether the court would have given it or not under the law that you're correct. Well, but in any ineffective assistance of counsel, you have to deal with the probability that had this. I mean, that's how we determine these cases is what is the probability that had it been tendered, it would have been granted. And in determining whether it would have been granted, you have to look and see what evidence was presented that Ms. Featherston was an accomplice. And quite honestly, there is no probable cause to believe that Ms. Featherston was guilty either as a principal or as an accessory. But it's a certainty if you don't tender it, it doesn't get given. But that's not the standard we're looking at. I understand. To me, I was, the very idea of tendering an accomplice instruction in here was kind of, this was surprising. This is, I had a case that I was working on last week where I was reading the transcript and the prosecutor called this a TODI defense, T-O-D-E-I, standing for the other dude did it. That is trial strategy. You say, my guy didn't do it, the other guy did it. And that's exactly what was done here is that the defense counsel is saying, my guy didn't do it, Featherston did it. Every time a defense counsel does that, does not warrant the instruction of an accomplice, to instruct a jury about an accomplice, simply because the defendant attempts to shift the blame to a third person, there has to be some evidence there that the third person truly was, excuse me, was an accomplice. We need to look at the facts here. One, we've already pointed out. The victim told the police officer who first arrived here. Two men attacked him. Second, we need to look at the fact that the victim and Featherston were and had been for years good friends. There's no indication that the victim, that Featherston was angry at the victim or that even the victim was angry at Featherston. The worst case scenario is that Mr. Moshlin was her sugar daddy. Why would she help beat up the man that had given her over $1,000 in a month? Apparently, Mr. Moshlin came to Ms. Featherston's house when she was entertaining another man and he wasn't happy about that. That might make the victim unhappy, but it wouldn't make Ms. Featherston unhappy, and I think the more logical inference would be that she would not want to lose this close relationship she had with the victim, which she most certainly would do if she helped attack him and beat him up. And I think the testimony of the victim and Ms. Featherston indicates that there's no hard feelings between the two of them. She testified that she never told anyone where the key was to his house. We know that Featherston and the defendant were both at Ms. Featherston's house that night. And here's an interesting thing, is that in his statement to the police, the defendant says that he refused to help. First he's asked to help earlier in the evening and he says no, and then he leaves and goes home, sees his wife and kid, comes back, and Peppers again asks him, let's go rob this guy. And according to his own statement, he says no, I won't do that. But he says he did leave with Peppers at that time and drive him around to different bars so that Peppers could find someone else to help him with this crime. Well then when did the crime occur? I mean, if you look at the time frames, if he left when he says he did to go drive Peppers around looking for another person, which by the way indicates in and of itself that this other person wasn't Featherston, but they're out driving around looking for someone, it doesn't leave any time for the crime itself to have been committed. So another interesting thing is that the one time that Featherston did drive Peppers, he drove around the park. It was a black Lincoln. The car that night, by independent evidence of the victim's neighbors, was a white vehicle very similar to Peppers' vehicle. And as I said before, the defendant was the one in possession of that white SUV that night. Did the neighbor witnesses testify as to the gender of the driver? No. I think it's also crucial how upset Ms. Featherston was when she heard what happened and that she went to the police herself the next morning before anybody ever asked her to. She felt bad about what happened. Yes, she had some inkling of what was going to happen in advance, and she liked this guy. She liked Mr. Moshman, and she wanted to do what she could to right this wrong. As we've noted before, mere knowledge that the crime is to be committed is not enough to make her an accomplice. Had she been married to Mr. Peppers in the past? I thought I saw that in the brief. I don't think so. She had yet another man that was her current boyfriend. There's some reference to an ex-husband, and I thought it was Mr. Peppers. Yes, that's right. There's reference that she was in bed with her ex-husband, and there's reference that she was in the bedroom with Mr. Peppers. Right, at the same time, but I presumed. I don't. But then her boyfriend is somebody else. Yes, her boyfriend is yet someone else. I ultimately concluded, because Featherston said she was not in there having sex with Peppers at the time, I ultimately concluded that Peppers was not, it's not very clear. I'll put it that way. So anyway, I guess the point of my argument is that without sufficient evidence that the instruction would have been granted, it can't have been an effective assistance of counsel not to ask. Thank you, Ms. Shanahan. Ms. Randall? Yes, Judy. Did Mr. Dreyfus indicate that she was an accomplice ever? No, he never did. He said he didn't know anything about it. Because he wasn't involved. Because he wasn't involved. So there was no testimony that he gave at any point to anybody or statement that she was involved in it. That's true. Okay. Okay. I just want to address a couple of points that Ms. Shanahan made. She's talking about how defendants got the SUV. Well, first of all, I just want to remind the court we're not making a reasonable doubt argument here. We're making an argument about ineffective assistance of counsel and in terms of presenting the defendant's theory of the case to the jury. She said that the evidence was that the defendant was driving the SUV all evening. If you look at the testimony of his ex-wife, he was apparently sheltering Mr. Peppers around all evening because Peppers didn't have a valid driver's license. But anyway, he went to Paducah, picked up his wife and kids, took them over to his mother-in-law's house. His wife said he couldn't have gotten very far because he called right away and she presumed that was from his father's house in Paducah. They talked for about an hour. Mr. Peppers beat them and said, bring the SUV back. He did that. But he was back on the phone with his ex-wife by 10 o'clock or shortly thereafter, and they talked until 1130 or midnight. So that means, and Mr. Drathen also said that when he dropped Peppers off at his house, he heard Peppers calling Featherston and Tammy Rogers to come over to his house. So according to that testimony, the jury couldn't believe that he didn't have that SUV at 10 o'clock, which is a couple of hours before Mr. Modulin was attacked. And Ms. Shanahan is also talking about how Featherston and Modulin had been friends for years. That's not entirely true. Mr. Modulin had known Featherston when she was a little girl, and she showed up again after his wife died, and they resumed their acquaintanceship. So to say that this is a lifelong friend that she'd never do anything to, that's a little bit misleading. And I don't know. Maybe the jury wouldn't believe that Ms. Featherston was a little bit of a manipulator. She's got Mr. Modulin taking her out to eat and giving her $1,000 maybe. She's got Peppers hanging around in her bedroom with her. And then Ms. Shanahan makes a big point about the first thing the next morning she's at the police station talking to the cops. She does not point out that no, she went home first and talked to her real boyfriend, Brian Hutchinson, and after that she decided to go talk to the police. That doesn't mean that she could not have formulated this plan to make Mr. Drafton the fall guy, so to speak, as opposed to her being the accomplice. So anyway, so far as Mr. Drafton driving Peppers around looking for somebody to help him break into Modulin's house, were they doing that or were they driving around looking for some beer? I think she said both things at some point. I'm not exactly sure. But in any event, since we're not arguing reasonable doubt, we're arguing the right to present a viable defense and have the jury consider it. When the defense counsel didn't offer that accomplice witness instruction, it surely couldn't have been given. And she's the most important witness in the case against him. He was denied a trial with the results worthy of giving sufficient weight, and that therefore we're arguing that the defendant should be given a new trial. Are there any other questions? I don't believe so. Thank you, Ms. Randolph. Thank you, Ms. Shanahan. Thank you for the matter under advisement.